UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 01/23/2015

GWENDOLYN A. GIBBS and
LANITA DREW,

               Plaintiffs,

-against-

CITY OF NEW YORK, POLICE COMMIS-
SIONER WILLIAM J. BRATTON, *of the
Police Department of the City of New York*,
POLICE OFFICER KARL SCHAEFFER, *in-
dividually*, POLICE OFFICER KARL
SCHAEFFER, *in his official capacity*, PO-
LICE OFFICER EDITH MIRANDA,
*individually*, POLICE OFFICER EDITH MI-
RANDA, *in her official capacity*,
SERGEANT DANIEL J. SWEENEY, *indi-
vidually*, and SERGEANT DANIEL J.
SWEENEY, *in his official capacity*,

               Defendants.

No. 12-CV-8340 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

When an employer requires an employee to attend alcohol counseling and treatment ses-

sions as a condition of keeping her job, must the employer compensate the employee for the time

she spends in counseling and treatment?  That is the central question in this lawsuit, in which

Plaintiffs Gwendolyn A. Gibbs and Lanita Drew claim that the failure of their employer, the New

York City Police Department ("NYPD"), to compensate them for attending such sessions runs

afoul of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA" or "Act").  Defendants

City of New York, NYPD, Police Commissioner William J. Bratton,[1] Police Officer Karl

---

[1] Plaintiffs originally named Raymond W. Kelly, then Commissioner of Police, as a defendant.  His succes-
sor, William J. Bratton, is automatically substituted as a defendant by operation of Fed. R. Civ. P. 25(d).  The Clerk
of Court is respectfully directed to correct the caption accordingly.

Schaeffer, Police Officer Edith Miranda, and Sergeant Daniel J. Sweeney (collectively, "Defendants") argue otherwise and now move for summary judgment.

Defendants first assert that, as a matter of law, Plaintiffs' attendance at the alcohol treatment and counseling sessions is not "work" within the meaning of the FLSA and that Plaintiffs are thus owed no compensation.  They further argue that, in any event, some of Plaintiffs' claims are time-barred under the FLSA and must be dismissed on that basis as well.[2]  Because the Court agrees with Defendants that, in the context of this case, the counseling and treatment sessions did not constitute compensable "work" for purposes of the FLSA, Defendants' motion is GRANTED. In light of its disposition with respect to the first question, the Court need not consider Defendants' second argument.

## I.   BACKGROUND[3]

The crux of this case involves the consequences under the FLSA of employee referrals by the NYPD to its Counseling Services Unit ("CSU") and other alcohol counseling and treatment providers, such as Alcoholics Anonymous ("AA").  The facts with respect to both Gibbs and Drew track the same broad outline:  Each was identified by the NYPD as having a problem with alcohol use, although in both cases, Plaintiffs disputed—and continue to dispute—such characterization as false.[4]  Next, each Plaintiff was required by the NYPD to attend mandatory alcohol treatment

---

[2] Specifically, Defendants argue that Gibbs' claims relating to counseling sessions before October 17, 2010 are time-barred because Gibbs cannot show that Defendants' actions were "willful" within the meaning of 29 U.S.C. § 255(a) such that she may take advantage of a three-year statute of limitations, instead of the usual two-year period. (See Def.'s Mem. Supp. Summ. J. ("Mem.") (Dkt. 40) 11–12.)  Defendants do not contest that the balance of Gibbs' and all of Drew's claims are timely.

[3] Unless otherwise noted, the relevant facts are drawn from the parties' Local Rule 56.1 statements (Dkt. 41 & 47) and are undisputed.

[4] Both Plaintiffs further contend that the record lacks any evidence suggesting that their alleged alcohol use was impacting their work.  The Court discusses the impact of these assertions in Part III.B.1 of this Opinion, *infra* at 13–20.

and counseling sessions, or else face disciplinary action including, potentially, termination. The counseling fell into three categories: inpatient counseling at a residential alcohol treatment facility, outpatient counseling during regular work hours provided by the CSU, and outpatient counseling provided by third-parties after regular work hours. Gibbs attended all three types of types of counseling, while Drew attended only the latter two. Ultimately, Gibbs' employment with the NYPD was terminated when she refused to continue counseling. Drew completed the required counseling program and remained employed with the NYPD as of the date this motion was brought.

## A.      The NYPD's Counseling Services Unit

The CSU exists to assist NYPD employees who have been identified as having drug or alcohol problems. Employees can be referred to the CSU by, among others, their commanding officers, by the NYPD's Medical Division, or by a family member or friend. Employees may also refer themselves. The CSU is certified by state authorities as an authorized outpatient treatment center. Defendant Daniel Sweeney served as the acting commander of the CSU when the facts underlying this case took place.

Once an employee is referred to the CSU, a counselor will meet with the employee to determine whether she has a problem with alcohol use. The counselor inquires into the nature of the employee's alcohol use by asking questions about matters such as dates and frequency, whether there is a family history of drinking, whether the employee had a progression in drinking, if the employee has experienced blackouts, and whether the employee has become sick before or after drinking. The counselor may also contact families, friends, and others to obtain a "global assessment" of the employee's alcohol use. (Schaeffer Dep. at 30:16–22.)

3

The goal of that assessment is to understand how the use of alcohol impacts the employee's employment, family life, financial situation, and personal life, and to determine whether the alcohol use is problematic. Once the assessment is complete, the CSU counselor discusses with supervisors whether the employee needs treatment and, if so, what treatment would be appropriate. In making that determination, the CSU staff is guided by the American Psychological Association's Diagnostic and Statistical Manual ("DSM").

**B.    Plaintiff Gibbs**

Gibbs was hired by the NYPD in 2009 and began working at the 63rd Precinct as a police administrative aide in January 2010. In that capacity, she performed clerical duties, such as answering the phone, completing accident reports, and taking money orders. On June 9, 2010, Gibbs' supervisor referred her to the CSU. The report, essentially in its entirety, stated: "[Gibbs] has been at work on several occasions with AOB [alcohol on breath]. On the last incident, 3 co-workers … reported that they all smelled AOB from [Gibbs]." (Decl. of Yuval Rubinstein ("Rubinstein Decl.") (Dkt. 42) Ex. H). All three of these employees later testified that they made no such report. (Jones Dep. at 24:9–22; Como Dep. 17:14–18:2, 19:20–20:7; 20:19–21:8; Benjamin Dep. 19:19–21, 21:4–10.)

Gibbs reported to the CSU four days later, where she was met by Defendant Karl Schaeffer, who introduced himself as a CSU counselor. Gibbs told Schaeffer that she drank when she "feel[s] like it." (Gibbs. Dep. at 26:25–27:3.) His report of that meeting stated in part:

> 1. Client reports drinking an unknown amount of cognac almost every day, after she would return home from work, for the past few years. ( Tolerance )

> 2. Client reports drinking in the morning for the past few months. Client further reports that it keeps her calm ( Withdrawal )

        3. Prior to this interview, the client reported that she had a drink this morning and had drunk the night prior. ( Great deal of time spent in using alcohol or recovering from its effects )

(Rubinstein Decl. Ex. I.)  Schaeffer ultimately concluded that Gibbs was alcohol dependent pursuant to the DSM.

        Schaeffer then informed Gibbs that she would be referred for 28 days of inpatient counseling.  Gibbs responded that she was not going and, in later conversations, elaborated that she did not need counseling and that she could not go because of concerns about who would care for her ill father.  Eventually, upon threat of suspension or termination, Gibbs agreed she would participate in an inpatient program at the Long Island Center for Recovery ("LICR").

        Gibbs arrived at LICR on June 16, 2010.  She was diagnosed upon admission as alcohol dependent.  While at LICR, Gibbs attended group meetings to discuss topics such as her feelings.  She was also given personal time to herself.  She was discharged on June 24.  The discharge summary stated that her prognosis was "extremely poor: the client needs to get open, honest, and willing." (Rubinstein Decl. Ex. J.)  During the time at LICR, she was paid her regular salary, without overtime.

        After her discharge, Gibbs returned to the CSU where she met again with Schaeffer.  Asked about her time at LICR, Gibbs said it was "it was pretty nice." (Gibbs Dep. at 65:17–18.)  Schaeffer then discussed Gibbs' treatment plan.  Gibbs was to meet with Schaeffer for individual counseling for one hour each week and attend a group session for women at the CSU for two-and-a-half hours each week.  In addition, Gibbs was to attend three AA meetings per week and, beginning in late July 2010, attend outpatient counseling at Bridge Back to Life ("BBL"), a treatment facility, for additional individual and group therapy.

Gibbs attended five or six of the group sessions held at CSU.  The record is not clear on how many individualized sessions she attended at CSU.  She also attended between 15 and 18 individual counseling sessions at BBL.  By December 9, however, she was no longer attending sessions there; her discharge diagnosis was "alcohol abuse." (Rubinstein Decl. Ex. M.)  Gibbs also began attending AA meetings in late June 2010 and continued attending them through February 2012. (Gibbs. Dep. 82:16–20.)

On December 8, 2010, her group counselor at CSU reported that Gibbs was present at the session with alcohol on her breath.  Gibbs denied she had drunk any alcohol, but said she had used Listerine in the morning and had been taking a cough-and-cold medication.  Based on the counselor's report, Gibbs was informed she would have to return to inpatient treatment.  Gibbs told Schaeffer she would not agree to return to inpatient treatment.  Gibbs' refusal led to a 30-day suspension beginning that day for refusing to comply with an order.

Gibbs returned to the CSU on January 7, 2011, following the 30-day suspension.  She was again ordered to attend inpatient treatment and again refused.  She was subject to a second 30-day suspension.  This was repeated for a third time on February 7, 2011.  Finally, on March 11, 2011, when Gibbs refused to attend inpatient treatment for a fourth time, her employment with the NYPD was terminated.

## C.    Plaintiff Drew

Drew began working for the NYPD in 1984 as an office aide.  At the time of the underlying facts, she was employed as a clerical associate in the redemptions unit of the Bronx Tow Pound.  Her duties included interacting with the public as a cashier and answering questions by phone.  On August 29, 2011, Drew was referred by her supervisor to the NYPD's Medical Division.  The referral was based on letters from her union stating that Drew was under stress and should not

work with the public.  That request came just a few months after Drew had taken a three-month medical leave to treat her depression and bipolar disorder.

Drew was ultimately referred to the CSU on or around September 20, 2011, where she met with Defendant Edith Miranda, a CSU counselor.  Miranda's notes from that session state that Drew reported "suffering [from] blackouts in the past, with blackout last being on 6/1/11 on her birthday when she drank more than her '3 drink max.'" (Rubinstein Decl. Ex. W.)  Miranda's report also indicates that Drew drank while on her prescription medications.  Drew was ultimately diagnosed as alcohol dependent.  Because Miranda was not a certified alcohol counselor, she consulted with Sweeney before making the determination.  For her part, Drew maintains that she did not black out on June 1, 2011 and that her last blackout was on her eighteenth birthday in 1978. (Drew Aff. ¶¶ 6–13.)

Sweeney informed Drew that she would be taken to an inpatient facility for counseling. Drew refused at that time and when she returned to the CSU again the next week.  At a third visit to the CSU, while accompanied by her union representative, Drew was offered outpatient treatment as an alternative, and she accepted.  Drew testified that she signed the agreement "because I didn't want to get suspended from work." (Drew Dep. 84:17–86:10.)

Drew's treatment plan provided that she would attend individual and group sessions at CSU.  In addition, she was to attend two outpatient group sessions and four AA meetings per week. The record is not clear as to precisely how many sessions Drew attended at CSU, but it appears to be in the dozens.  Drew was paid for her attendance at these sessions.  Drew also attended four AA meetings between October 2011 and February 2012 and two sessions per week at Arms Acres, an outpatient facility, during the same period.  On October 6, 2011, Drew was diagnosed by Arms Acres as "alcohol dependent." (Rubinstein Decl. Ex. X.)  The counselor's report indicated that

Drew "has a history of alcohol abuse" and that she "needs education [on] substance abuse and would benefit from therapeutic 1/1 sessions." (Id.)

Drew was discharged from the CSU on February 22, 2012, after completing her treatment plan.  She was subject to continual monitoring by the CSU until October 2013, wherein she went to the CSU once every three months for a one-hour meeting.  She was paid for her attendance at those meetings.

**D.    Procedural History**

Plaintiffs first brought this action in New York State Supreme Court, New York County, in October 2012, asserting claims under both the FLSA and various state constitutional and statutory provisions.  Defendants removed the case to federal court on November 15, 2012 on the basis that the claims included a federal question. (Dkt. 1.)  After a motion from Plaintiffs, this Court declined to exercise supplemental jurisdiction over the state law claims and remanded all such claims for reasons stated on the record. (Dkt. 21 & 26.)  Following discovery, Defendants filed the instant motion for summary judgment. (Dkt. 39.)

## II.   LEGAL STANDARD

Fed. R. Civ. P. 56(a) instructs that a moving party is entitled to summary judgment if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "The substantive law governing the case will identify those facts that are material, and only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (internal quotation marks and alterations omitted).  A dispute is "genuine" for purposes of summary judgment "where the evidence, viewed in the light most favorable

to the nonmoving party, is such that a reasonable jury could decide in that party's favor." Id. (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact." Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 486 (2d Cir. 2014) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).  There are numerous ways the moving party—Defendants here—can meet this burden including, for example, by "establish[ing] that plaintiffs are unable to prove at least one of the essential elements of their claims." In re World Trade Ctr. Lower Manhattan Disaster Site Litig., 758 F.3d 202, 210 (2d Cir. 2014) (quoting Rubens v. Mason, 527 F.3d 252, 255 (2d Cir. 2008)) (internal quotations marks, alteration, and citation omitted); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

### III.  DISCUSSION

Plaintiffs' claims relate to three distinct aspects of the counseling they were required to undertake: inpatient counseling at a residential treatment facility, with respect to Gibbs alone; outpatient counseling *during* regularly-scheduled work hours; and outpatient counseling *after* regularly scheduled work hours.  There is no dispute between the parties that Gibbs was paid her regular wage—but not overtime—for the inpatient treatment.  (See Gibbs Dep. at 61:21–62:4.) There is similarly no dispute as to compensation for the workday sessions, as both Plaintiffs were paid for attending them.  (See Gibbs Dep. at 44:7–11; 85:1–8; Drew Dep. at 66:21–67:3; 73:18–74:5.)  Finally, there is no dispute that Plaintiffs were not paid overtime for the after-hours sessions. (See Def.'s Mem. Supp. Summ. J. ("Mem.") (Dkt. 40) 3.)

The present dispute thus concerns, first, whether Gibbs is entitled to overtime for the inpatient treatment and, second, whether Gibbs and Drew are each owed overtime for the after-hours

sessions.[5]  Plaintiffs ultimately bear the burden of establishing that the counseling sessions consti-

tute "work" under the FLSA for which they are consequently owed overtime.  Grochowski v.

Phoenix Const., 318 F.3d 80, 87 (2d Cir. 2003).  In this Circuit, whether an employee is entitled

to overtime pay is a mixed question of law and fact.  Holzapfel v. Town of Newburgh, N.Y., 145

F.3d 516, 521 (2d Cir. 1998); accord Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 558

(2d Cir. 2012).  It falls to the trial judge to determine whether the employee's activities "could

potentially constitute 'work,'" while it falls to the jury to determine how much time was spent

"within the court's definition of 'work.'" Holzapfel, 145 F.3d at 521.  Here, the Court's answer to

that first question resolves the parties' dispute.

## A.    The FLSA and the Portal–to–Portal Act

The Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, was enacted to ensure that employ-

ees receive a "fair day's pay for a fair day's work," Overnight Motor Transp. Co. v. Missel, 316

U.S. 572, 578 (1942) (quoting 81 Cong. Rec. 4983 (1937) (message of President Franklin D. Roo-

sevelt)); see also 29 U.S.C. § 202(a).  The Act seeks to achieve that goal by "guaranteeing

compensation for all work or employment engaged in by employees covered by the Act." Ten-

nessee Coal, Iron & R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 602–03 (1944).  More

specifically, the Act's central provisions provide that, regardless of any custom or contract to the

---

[5] Notwithstanding that Plaintiffs were paid for the workday sessions and that Gibbs was paid for part of her inpatient treatment, Defendants categorically assert that "the time [Plaintiffs] spent in alcohol treatment and counseling is not compensable 'work' under the FLSA" (Mem. 9).  Plaintiffs argue the opposite: "the time is compensable under the FLSA" (Plf.'s Mem. Opp. Summ. J. ("Opp.") (Dkt. 46) 13).  It is unclear whether Defendants take the view that they were under no FLSA obligation to compensate Plaintiffs for the workday sessions and part of Gibbs' inpatient treatment, but that they did so out of benevolence or for some other reason.  Nor do Plaintiffs argue that the fact that Defendants provided compensation for some sessions amounts to a concession that the activities were, at least in part, "work" for FLSA purposes.  In any event, without the benefit of briefing on this point by either party, the Court makes no inference one way or the other and proceeds to analyze the broader issue from established principles.  As will be discussed, the answer to the broader question obviates the need for additional inquiry into the specific claims.

contrary,[6] covered, non-exempt workers must be paid a minimum wage, 29 U.S.C. § 206(a)(1), as well as overtime wages (that is, wages at 1½ times the regular rate) for work exceeding 40 hours a week, 29 U.S.C. § 207(a)(1).  In the nearly eight decades since the FLSA became law, however, the question of what actually amounts to "work" under the Act has proven to be a particularly thorny one because the Act's authors left the term undefined.  As a result, the task of giving "work" meaning has fallen to the courts in what has been "a landslide of litigation." Sandifer v. U.S. Steel Corp., 134 S. Ct. 870, 875 (2014).

In its very first FLSA case, the Supreme Court articulated what remains the key definition: work is "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." Tennessee Coal, 321 U.S. at 598.  The Court soon clarified, however, that "exertion" is not in fact necessary for an activity to constitute "work," because "an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen." Armour & Co. v. Wantock, 323 U.S. 126, 133 (1944).  Two years later, the Court further clarified that "work" "includes all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 690–91 (1946).

Organized labor soon seized on this trilogy of "expansive definitions," Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. 513, 516 (2014), by filing so-called "portal" actions, whereby employees sought compensation for time spent on activities such as walking from a mine "portal" or entrance to their workstations, or changing into their work clothes. See Sandifer, 134 S. Ct. at 875.  In the face of a surge in portal actions, Anderson's broad conception of "work" was "short-lived." Gorman v. Consol. Edison Corp., 488 F.3d 586, 590 (2d Cir. 2007).  Congress soon stepped

---

[6] Setting aside some exceptions, "[t]he Fair Labor Standards Act provides minimum standards that may be exceeded, but cannot be waived or reduced." 29 C.F.R. § 541.4.

in, apparently alarmed that the breadth of <u>Anderson</u> would create "wholly unexpected liabilities

… upon employers," § 1(a), 61 Stat. 84.

Congress's answer was the Portal–to–Portal Act of 1947, 29 U.S.C. §§ 251 *et seq.*, which

provided that, in the absence of a contrary contract or custom, an employer is not required by the

FLSA to compensate an employee

> for or on account of any of the following activities …

>> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

>> (2) activities which are preliminary to or postliminary to said principal activity or activities,

> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a).  In the years since the Portal–to–Portal Act went into effect, the second of

these exceptions—activities that are "preliminary" or "postliminary" to an employee's "principal

activity or activities"—has been hotly contested.  <u>See, e.g.</u>, <u>Integrity Staffing</u>, 135 S. Ct. 513; <u>Gor-</u>

<u>man</u>, 488 F.3d 586.  Significantly, however, the Supreme Court has made clear that "[o]ther than

its express exceptions for travel to and from the location of the employee's 'principal activity,'

and for activities that are preliminary or postliminary to that principal activity, the Portal–to–Portal

Act does not purport to change this Court's earlier description[] of the term[] 'work.'" <u>IBP, Inc. v.</u>

<u>Alvarez</u>, 546 U.S. 21, 28 (2005); <u>see also</u> <u>Gorman</u>, 488 F.3d at 590.

In sum, "the basic principle that underlies the FLSA [is that] [e]mployees are entitled to

compensation only for 'work.'" <u>Reich v. N.Y. City Transit Auth.</u>, 45 F.3d 646, 651 (2d Cir. 1995).

As an initial matter, "if an activity fails the <u>Tennessee Coal</u> test … the activity is not work and is

not compensable." <u>Chao v. Gotham Registry, Inc.</u>, 514 F.3d 280, 286 (2d Cir. 2008).  Even if an activity falls within <u>Tennessee Coal</u>'s definition, however, it may be excluded by either of the twin exceptions contained in Section 4 of the Portal–to–Portal Act, 29 U.S.C. § 254(a).  <u>See</u> <u>IBP</u>, 546 U.S. at 28; <u>Gorman</u>, 488 F.3d at 590.[7]  Only if the activity emerges unscathed from this two-step analysis, is it, a matter of law, "work" under the FLSA.

**B.      Were the Alcohol Counseling Sessions "Work"?**

Defendants argue that the counseling sessions fail the <u>Tennessee Coal</u> test (Mem. 9–11; Def.'s Reply Mem. Supp. Summ. J. (Dkt. 48) 6–7), and, even if they did satisfy that test, that the sessions are non-compensable postliminary activities under the Portal–to–Portal Act (<u>id.</u> at 5–9).  Plaintiffs resist both conclusions, arguing the sessions fall within the common law definition of "work" (Plf.'s Mem. Opp. Summ. J. ("Opp.") (Dkt. 46) 10–13), and that the Portal–to–Portal Act has no application in this context (<u>id.</u> at 15–19).  Defendants have the better of the argument: On this record, the counseling sessions do not amount to "work" as understood by <u>Tennessee Coal</u> and its progeny.  Although that conclusion is sufficient to decide this case, because the parties have extensively briefed the scope of the Portal–to–Portal Act, the Court continues to the second stage of the analysis and concludes that the counseling sessions, even if they were "work" under <u>Tennessee Coal</u>, would amount to non-compensable postliminary activities.

**1.      The Counseling Sessions Are Not "Work" Under <u>Tennessee Coal</u>**

As articulated in <u>Tennessee Coal</u>, the activity must be both "controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." 321 U.S. at 598.  Here, the record discloses no dispute that the counseling sessions were required

---

[7] The Portal–to–Portal Act is not the sole statutory exception.  <u>See</u> 29 U.S.C. § 203(o) (creating a limited exception for time spent changing clothes and washing-up); <u>see also</u> <u>Sandifer</u>, 134 S.Ct. 870.

by the NYPD.  In Gibbs' case, she was advised that a failure to accept counseling "can lead to suspension or termination." (Gibbs Dep. at 36:23–25.)  Indeed, when Gibbs eventually refused to attend further counseling sessions, she was subject to progressive discipline for "fail[ing] and ne-glect[ing] to comply with [an] order." (Rubinstein Decl. Ex. O; see also Ex. P & Q.)  That refusal ultimately led to her employment being terminated.  Drew, similarly, testified that she agreed to the counseling because she "didn't want to get suspended from work." (Drew Dep. at 84:17–18.)  That testimony is confirmed by counselor notes from Arms Acres that make plain that the "reason for admission/referral source" was "p[atien]t mandated by employer nypd." (Rubinstein Decl. Ex. Z.)  Given that Defendants appear to concede that this prong of Tennessee Coal has been estab-lished on this record,[8] more need not be said about it.[9]

Thus the remaining, dispositive issue under the Tennessee Coal test is whether the coun-seling sessions were pursued "necessarily and primarily for the benefit of the employer." 321 U.S. at 598.  That is not an either-or proposition.  Rather, the question is whether the time "is spent predominantly for the employer's benefit or for the employee's," and that inquiry depends "upon all the circumstances of the case." Singh v. City of New York, 524 F.3d 361, 367 (2d Cir. 2008)

---

[8] See Mem. 7 (noting that "plaintiffs are also unable to satisfy the Tennessee Coal definition of 'work,' as the time spent in alcohol treatment and counseling was not 'pursued necessarily and primarily for the [NYPD's] ben-efit'" (citing Tennessee Coal, 321 U.S. at 598) (alterations in original), but making no mention of the first prong of the Tennessee Coal test).

[9] In particular, the Court need not consider whether an activity that is purportedly "voluntary" can nonetheless be "required" for purposes of the first prong of Tennessee Coal.  In this regard, the Court notes that each of Plaintiffs' treatment records includes a document labeled "Treatment Agreement & Client Confidentiality Statement." (Decl. of Steven E. Sykes ("Sykes Decl.") (Dkt. 45), Ex. Q & R.)  That document states: "I understand that this treatment is voluntary and although refusal to accept and/or complete this treatment may lead to my separation from employment and/or disciplinary action against me, I am under no obligation to enter in, remain in or complete this treatment."  At the bottom of this document, both Plaintiffs have acknowledged in their own hand having "read and understood this contract."  Each of Plaintiffs' treatment records also includes an additional document entitled "Voluntary Participation Statement," which includes similar language regarding the "voluntary" nature of the program.  (See Sykes Decl. Ex. Q & R.)  Although neither of the parties has briefed the point, the Court notes that the Department of Labor has taken the position (albeit in a different but related context) that "[a]ttendance is not voluntary, of course, if it is required by the employer," nor is it voluntary "if the employee is given to understand or led to believe that … the continuance of his employment would be adversely affected by nonattendance." 29 C.F.R. § 785.28.

(quoting Armour, 323 U.S. at 133 (1944)) (emphasis added).[10]  Here, several factors ultimately lead to the conclusion that the counseling sessions were not predominantly for the benefit of the NYPD.

First, there is no evidence in the record to suggest that the counseling sessions benefited the NYPD in any relevant way.  Of course, that is not to suggest that the NYPD does not benefit from having sober employees.[11]  Nor is it to suggest that the NYPD does not benefit in some manner from rehabilitating employees whose employment, rightly or wrongly, might otherwise be prematurely terminated, potentially necessitating an investment in hiring and training a new employee.  But these are not the kinds of benefits that courts have recognized as decisive in this context.  Something more is required.  Thus, in the only case of which the Court is aware where an employee's continued employment was held to amount to a benefit to the employer, the court stressed the fact that the counseling sessions helped ensure that the employee "stayed on the job in a position that was short-staffed."  Sehie v. City of Aurora, 432 F.3d 749, 752 (7th Cir. 2005).[12]

---

[10] The "predominant benefit" standard grew out of employee break time cases.  See Reich v. S. New England Telecomms. Corp., 121 F.3d 58, 64–65 (2d Cir. 1997) (collecting cases).  The Second Circuit, however, has found utility for the approach in other contexts, see, e.g., Singh, 524 F.3d 361 (employee commuting time), and the Court sees no reason not to apply it in the present context.

[11] This commonsensical observation notwithstanding, Defendants, perhaps in an attempt to disclaim any benefit to the NYPD whatsoever, observe that "[t]here is no federal, state, or municipal law that requires the NYPD to operate the CSU, nor is the NYPD required by law or regulation to ensure that members of the service are sober."  Mem. 7.

[12] The Sehie court noted that the fact that the employer was short staff "combined" with the fact that the "sessions [were] a mandatory condition of [the employee's] continued employment … create[d] a strong inference that the counseling sessions were for [the employer's] benefit."  432 F.3d at 752.  Plaintiffs, presumably drawing on the Sehie court's emphasis on the mandatory nature of the counseling sessions, seek an inference that the NYPD benefited on the same basis. (See Opp. 13 ("Defendants made a decision to order these employees to attend alcohol counseling.  Therefore, it was for the employer's benefit, not the employees['].").)  Such an inference is misplaced.  Although it is true that Sehie stressed the mandatory nature of the counseling in that case as part of its discussion of which party benefited, the mandatory nature of an activity is properly considered at the first prong of the Tennessee Coal test, which asks whether an activity is "controlled or required by the employer," 321 U.S. at 598, and not at the second prong, which asks whether an activity is "pursued necessarily and primarily for the benefit of the employer and his business."  Id.  Indeed, if the Court were to adopt Plaintiffs' reasoning, any activity that met the first prong of Tennessee Coal because it was mandatory would necessarily satisfy the second prong.  For that reason, an employee must show something more at the second prong if that aspect of the test is to have any purpose.  As noted above, the Court is satisfied that the counseling sessions at issue here meet the first prong of Tennessee Coal.  See discussion,

Put differently, it was the fact that the employer was short-staffed, combined with other factors on that record, that led the <u>Sehie</u> court to conclude the employer was the primary beneficiary.  <u>Id.</u> at 751–52.  Lacking any evidence pointing to a similar or otherwise notable benefit to the employer, the two other courts that have considered this question have thus reached the opposite conclusion. See <u>Makinen v. City of New York</u>, No. 11-CV-7535 (ALC), 2014 WL 5036747, at *17 (S.D.N.Y. Sept. 30, 2014) ("what matters in the compensable work analysis is that the NYPD certainly did not benefit, as [the two employee police officers] were not crucial to their operations"); <u>Todd v. Lexington Fayette Urban Cnty. Gov't</u>, No. CIV.A.5:08-295 (KKC), 2009 WL 4800052, at *6 (E.D. Ky. Dec. 10, 2009) ("no evidence has been presented that [employer police department] has a shortage of police officers and that the police department needed to retain [employee's] services").  This case is more akin to <u>Makinen</u> and <u>Todd</u> than it is to <u>Sehie</u>.  Because the record here contains no suggestion that Plaintiffs' continued employment was particularly valuable to the NYPD—there is no suggestion, for example, that Plaintiffs' positions were short-staffed—there is an insufficient basis to conclude that the NYPD benefited in a relevant manner from the counseling sessions.[13]

---

<u>supra</u> at 13–14.  The question is whether Plaintiffs can show that the counseling sessions were "necessarily and primarily for the benefit of the [NYPD] and [its] business."  <u>Tennessee Coal</u>, 321 U.S. at 598.

[13] Defendants have sought to introduce evidence that Plaintiffs' rehabilitation was affirmatively *not* necessary to maintaining the NYPD's staffing needs.  <u>See</u> Mem. 8.  In a two-page affidavit, Inspector Thomas Burns, commanding officer of the NYPD's Employee Relations section, avers that "[t]he NYPD hires to meet its authorized headcount as needed and does not need to rely on the proportionally small number of members referred to the CSU to meet its staffing and other Departmental needs." (Decl. of Thomas Burns ¶ 6,  Rubinstein Decl. Ex. D.)  He further states that "[c]ounseling services are provided to members of the service for their personal benefit, so that they may become rehabilitated and reach their potential with the NYPD. … Had the NYPD not set up this program for its employees' benefit, many of those members' careers would likely have ended prematurely." (<u>Id.</u> ¶ 7.)  Plaintiffs object to the Burns Affidavit on the basis that Inspector Burns was not identified as a person with relevant information during discovery and thus argue that his affidavit is inadmissible. (<u>See</u> Plf.'s 56.1 ¶ 19(a).)  Defendants have not responded to this objection, and the Court thus accepts Plaintiffs' assertion of non-disclosure as true.  Under the Federal Rules of Civil Procedure, a party must disclose the names of "each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses …" Fed. R. Civ. P. 26(a)(1)(A).  This requirement is "facial[ly] stringen[t]."  <u>Fleming v. Verizon New York, Inc.</u>, No. 03-CV-5639 (WHP), 2006 WL 2709766, at *8 (S.D.N.Y. Sept. 22, 2006).  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a

Second, and conversely, there is evidence in the record that supports the conclusion that Plaintiffs benefited from the counseling sessions.  One of the CSU counselors testified that the group's purpose is "to help members of the service who have been identified as having drug or alcohol problems, where the job deems that it's somehow impacted their employment." (Schaefer Dep. at 19:21–25.)  Where an employee's job performance has been affected by alcohol use such that an employer has cause to discipline or terminate the employee, it seems indisputable that the counseling sessions benefit the employee because they provide an alternative to discipline or termination: Instead of potentially losing her job, the employee is offered a second chance contingent on completion of the counseling.  But even where such cause may not or does not exist,[14] employees may still be the beneficiaries of counseling sessions.  See, e.g., Makinen, 2014 WL 5036747, at *17 ("While [the employee police officers] vehemently object to the conclusion that their treatment was anything other than unwarranted and detrimental, what matters in the compensable work analysis is that … [the officers] were in any event the *intended* beneficiaries of the treatment.") (emphasis in original); Todd, 2009 WL 4800052, at *6 ("There is no indication that there had been any problem with [the employee police officer's] on-duty performance. … [T]he counseling sessions were not designed to improve his on-duty performance, but to keep him at its existing level in the face of the reasonable threat that his substance abuse problems might make him unfit for duty ....").  As in Makinen and Todd, here, the counseling sessions served to ensure that employees

---

trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  Though its purpose is to prevent the practice of "sandbagging" an adversary with new evidence, Ventra v. United States, 121 F. Supp. 2d 326, 332 (S.D.N.Y. 2000), "Rule 37(c)(1) by its terms does not require a showing of bad faith."  Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir. 2006).  Here, lacking any proffered justification whatsoever from Defendants explaining their failure to identify Inspector Burns during discovery, the Court, having taken account of the factors articulated in Patterson v. Balsamico, 440 F.3d 104 (2d Cir. 2006), declines to consider Inspector Burns's evidence.

[14] The Court notes that there is no evidence in the record to support the conclusion that Plaintiffs' job performance was adversely affected by alcohol use.  See Plf.'s 56.1 ¶ 7(a).  While, for the reasons discussed above, the Court concludes that whether Plaintiffs were alcohol dependent and whether their job performance was affected is irrelevant for FLSA purposes, these issues may be highly relevant to, for example, a claim by Gibbs for dismissal without just cause.  The Court does not opine on the merits of any such claim.

who were perceived by their employer—rightly or wrongly—as suffering from a condition that could threaten their job performance and continued employment were provided support.[15]  In short, the counseling sessions served as proactive assistance to the employees whose continued employment could have been in jeopardy.

Although the Court recognizes that only Gibbs, and not Drew, acknowledged the personal benefit she received from the counseling sessions,[16] Plaintiffs' subjective beliefs as to which party benefited are not controlling under Tennessee Coal.  *Cf.* Boaz v. FedEx Customer Info. Servs., Inc., 725 F.3d 603, 607 (6th Cir. 2013) ("An employee's subjective belief that her position was exempt from the FLSA … does not mean the position was exempt as a matter of law."); Brock v. Mr. W Fireworks, Inc., 814 F.2d 1042, 1049 (5th Cir. 1987) ("Subjective beliefs cannot transmogrify objective economic realities.  A person's subjective opinion that he is a businessman rather than an employee does not change his status [as a matter of law under the FLSA].") (internal quotation marks and citation omitted).  Whether a particular activity can constitute "work" under the FLSA is a question of law in this Circuit.  Holzapfel, 145 F.3d at 521.  As such, the Court, not Plaintiffs, is ultimately tasked with determining whether the employee or employer was the predominant beneficiary under Tennessee Coal.

Third, although neither of the parties have briefed this point, the record reflects that the NYPD did not assume primary responsibility for the cost of the counseling.  The "Treatment Agreement & Client Confidentiality Statement" signed by Plaintiffs includes a provision stating

---

[15] There is no dispute that the NYPD perceived Plaintiffs as alcohol dependent.  See Plf.'s 56.1 ¶¶ 28, 89.  Although, as previously noted, Plaintiffs dispute the correctness of this conclusion, they do not dispute that the conclusion was made.

[16] Gibbs testified that the AA counseling session helped her with "mind awareness" (Gibbs Dep. at 81:22–82:2) and she continued attending these sessions for a year after her termination (id. at 82:16–83:12).  With respect to her counseling sessions at BBL, when asked whether she benefited from these sessions, Gibbs explicitly said "yes" because the sessions "gave me time to talk to someone." (Id. at 73:2–5.)  By contrast, when asked the same question, Drew unequivocally said, "No." (Drew Dep. 76:25–79:3; 93:3–9.)

18

that the *employee* accepts responsibility "[t]o make payments for necessary rehabilitation [or] other treatment expenses at the established rate when insurance does not cover the cost." (Decl. of Steven E. Sykes ("Sykes Decl.") (Dkt. 45), Ex. Q & R.)  As such, unlike in <u>Sehie</u>, where the employer assumed responsibility for 90 percent of the cost of counseling, here, responsibility was divided between the employee and her insurer.[17]  <u>See also</u> <u>Todd</u>, 2009 WL 4800052, at *6 (concluding that the employee was the primary beneficiary because, among other things, he "apparently bore the costs of his various treatments").  Although this factor on its own is not deceive, it reinforces the conclusion that Plaintiffs, not Defendants, were the predominant beneficiaries of the counseling.

In opposing summary judgment, Plaintiffs assert that there are genuine issues of material fact as to who primarily benefited from the counseling sessions, but they offer no explanation as to what those material disputes might be. (<u>See</u> Opp. 2, 13, 20.)  They must do more than rely on such bare assertions.  When viewed in the light most favorable to Plaintiffs, the record discloses no genuine issue of material fact as to the decisive question in this case:  whether the counseling sessions were predominantly for the benefit of the NYPD.  Because they were not, the counseling sessions fail to meet the second prong of <u>Tennessee Coal</u>, and consequently do not constitute "work" under the FLSA.[18]

---

[17] Presumably some costs of administering the CSU were borne by the NYPD.  Although that information is not in the record, even if it were, it would not change the fact that, unlike in <u>Sehie</u>, the employee and a third party assumed what appears to be principal responsibility for the cost of counseling.

[18] The Department of Labor's regulations concerning "[a]ttendance at lectures, meetings, training programs and similar activities," 29 C.F.R. § 785.27, provides no basis for a different conclusion.  As an initial matter, Plaintiffs fail to cite a single case holding—or even suggesting—that the counseling sessions fall within the definition of "lectures, meetings, training programs and similar activities."  Indeed, neither of the two counseling cases cited by the parties analyze the "work" issue through the lens of § 785.27.  <u>See</u> <u>Sehie</u>, 432 F.3d 749; <u>Todd</u>, 2009 WL 4800052.  Nor does <u>Makinen</u>, 2014 WL 5036747.  In any event, § 785.27 exists within a part of the regulations applying the <u>Tennessee Coal</u> principles "to the problems which arise frequently," 29 C.F.R. § 785.10, thus serving as a "practical guide to employers and employees." <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 138 (1944).  It is not a definitive interpretation of the Act and, while courts must respect the Wage and Hour Administrator's interpretations, they are not bound by them.  <u>Id.</u> at 140.

In so concluding, the Court is mindful of "the practical consequences of the plaintiffs' challenge."  Singh, 524 F.3d at 369; see also Holzapfel, 145 F.3d at 522–23 (rejecting "[a]n un-critical application of the definition of work" in favor of one that has due regard for "common sense and policy concerns").  Indeed, although they do not drive the Court's conclusion, practical concerns resonate here.  To hold that the FLSA requires an employer to compensate in the circum-stances of this case would risk creating a material disincentive to the growing use of employee assistance programs and so-called "last-chance agreements" in this and similar circumstances. See, e.g., Basso v. Potter, 596 F. Supp. 2d 324, 329–30 (D. Conn. 2009) (Postal Service employee agrees to "structured alcohol rehabilitation" as part of a "last chance" to keep his job after notice of termination for alcohol-related problems); Mayo v. Columbia University, No. 01-CV-2002 (LMM), 2003 WL 1824628, at *1–2, *6 (S.D.N.Y. April 7, 2003) (Columbia University offers absentee alcoholic employee last-chance agreement in lieu of likely termination so he may partic-ipate in an "accredited program of treatment and rehabilitation for alcohol abuse").[19]  As Defendants rightly point out, in cases such as this one, the option of a mandatory referral to CSU serves as an alternative to an employee's "receiving harsher discipline and potentially even avoid[ing] separation from employment." (Opp. 8.)[20]  It thus stands to reason that requiring an

---

[19] To do so would also appear to go beyond an employer's obligations under related statutes, such as the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq.  In the context of treatment for alcohol depend-ency, "the ADA's requirement that an employer reasonably accommodate an alcoholic employee requires no more than that such employee be given unpaid time off to participate in a treatment program."  Van Ever v. New York State Dept. of Corr. Services at Sing Sing Corr. Facility, No. 99-CV-12348 (SAS), 2000 WL 1727713, at *3 (S.D.N.Y. Nov. 21, 2000) (quoting Woolcott v. E.I. Dupont De Nemours & Co., Inc., No. 95-CV-721 E(F), 1997 WL 251475, at *4 (W.D.N.Y. Apr. 29, 1997).

[20] Defendants might also have argued that sobriety is a precondition—and continuing condition—to employ-ment with the NYPD.  Indeed, Defendants do cite, in the course of their discussion of 29 C.F.R. § 785.27, two cases from other circuits holding that mandatory training programs are non-compensable where their satisfaction relates to a precondition of employment.  (See Mem. 10, citing Bienkowski v. Northeastern Univ., 285 F.3d 138, 141 (1st Cir. 2002); Chao v. Tradesman Int'l, Inc., 310 F.3d 904, 910 (6th Cir. 2002)).  Defendants, however, never make the precondition argument and, as noted, see supra n. 11, assert that the NYPD is not "required by law or regulation to ensure that members of the service are sober."  (Mem. 7.)

employer to compensate an employee for time spent in such treatment would disincentivize treatment relative to other options, such as discipline and termination.

That said, there is no bar to employees and employers negotiating compensation for mandatory participation in counseling programs through the ordinary bargaining process, just as employers remain free to provide compensation for participation in such programs should they so choose.  The collective bargaining process has yielded mutually beneficial results in other contentious FLSA cases.  See, e.g., N.Y. City Transit Auth., 45 F.3d at 647–48 (parties amend contract to include some compensation for police K-9 handler's care of dogs at their homes after FLSA litigation).  And as indicated earlier, the NYPD did offer some compensation to Plaintiffs for significant aspects of their time in counseling, even though, as the Court now concludes, the FLSA placed no obligation on the NYPD to do so.

### 2.   The Counseling Sessions Are Excluded From the Definition of "Work" Under The Portal–to–Portal Act

Even assuming the counseling sessions constituted "work" under the Tennessee Coal test, they would be excluded from the definition by operation of the Portal–to–Portal Act on the basis that the sessions were neither principal activities nor activities integral and indispensable to such principal activities, but rather non-compensable postliminary activities.  The distinction between what constitutes a "principal activity," on the one hand, and "preliminary" or "postliminary" activities, on the other, has often proved "elusive in application." Gorman, 488 F.3d 586 at 590.  See also N.Y. City Transit Auth., 45 F.3d 646, at 649 ("The authorities offer little guidance … [a]nd the guidance that does exist tends to be circular.").  The Supreme Court's recent decision in Integrity Staffing, 135 S. Ct. 513, however, provides some helpful clarification.

Integrity Staffing offers two significant takeaways.  First, whether a particular activity is "required" or "for the benefit" of an employer is not the appropriate question under the Portal–to–

Portal Act. Id. at 519 ("The Court of Appeals erred by focusing on whether an employer *required* a particular activity. … If the test could be satisfied merely by the fact that an employer required an activity, it would sweep into 'principal activities' the very activities that the Portal–to–Portal Act was designed to address. …   A test that turns on whether the activity is for the benefit of the employer is similarly overbroad.") (emphasis in original).  That conclusion flows naturally from—and avoids rendering redundant—the Court's definition of "work" under Tennessee Coal.  See 321 U.S. at 598 ("[to qualify as "work," an activity must be] controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business.").  Rather—to the second point—the appropriate question under the Portal–to–Portal Act is whether the particular activity is among the "principal activit[ies] … which [the] employee is employed to perform" or whether that activity is "an intrinsic element of those [principal] activities and one with which the employee cannot dispense if he is to perform his principal activities."  Integrity Staffing, 135 S. Ct. at 518 (internal citations omitted, second alteration in original).

On the facts in Integrity Staffing, which concerned security screenings required of employees after they completed their shifts at an Amazon.com warehouse, a unanimous Court observed that the employer "did not employ its workers to undergo security screenings, but to retrieve products from warehouse shelves and package those products for shipment to Amazon customers." Id. Similarly, the screenings were not an integral and indispensable part of the employees' duties because "[t]he screenings were not an intrinsic element of retrieving products from warehouse shelves or packaging them for shipment." Id.  Accordingly, "[t]he security screenings at issue [in Integrity Staffing were] noncompensable postliminary activities." Id.

That logic dictates the outcome in this case as well.  Gibbs' regular tasks consisted of answering the telephone, completing accident reports, and taking money orders. (Gibbs Dep. at

11:15–17.)  Drew was charged with interacting with members of the public who were redeeming their towed cars from the pound. (Drew Dep. at 18:20–24.)  None of those activities bears any relation to the consumption of alcohol or treatment to address it.  As a result, the counseling sessions were neither indispensable nor integral to Plaintiffs' principal activities.  See Makinen, 2014 WL 5036747, at *17 ("there is no legitimate dispute here that [the employees'] treatment was not an indispensable part of their duties as police officers"); Todd, 2009 WL 4800052, at *7 ("[the employee's] treatment was not an indispensable part of the primary activities of his employment as a police officer. … [T]he primary activities of police officers include activities such as patrol assignments, apprehending criminals, performing investigations and responding to the various happenings of daily life affecting the public safety.").  Accordingly, to the extent that the counseling sessions here constituted "work" under Tennessee Coal—which, as noted above, the Court concludes they did not—the counseling sessions would nonetheless be non-compensable postliminary activities under the Portal–to–Portal Act.

## IV.   CONCLUSION

For these reasons, the Court concludes that, in the context of this case, Plaintiffs' required attendance at the alcohol treatment and counseling sessions was not compensable "work" within the meaning of the FLSA.  Defendants' motion is therefore GRANTED.  The Clerk of Court is respectfully requested to close the motion pending at Dkt. 39 and to close this case.

SO ORDERED.

Dated:      January 23, 2015
            New York, New York

_____
            Ronnie Abrams
            United States District Judge